## SALE AND DELIVERY OF GOODS.

MACTIER'S ADM'RS. *v.* FRITH, 6 Wend. 103–158.

In Chancery, reported 1 Paige, 34, under title of FRITH v. LAWRENCE, Administrator of Mactier.

*Sale and Delivery of Goods.    Stoppage in    Transitu.*
*Costs.*

H. MACTIER was a commission merchant in N. Y., and died about the 10th of April, 1823.   The complainant is a resident at Jacmel, Hayti.   He filed a bill in this case against the administrators of Mactier, claiming a certain shipment of brandy, a part of which had been sold by Mactier in his life time, and the residue by the defendant.   He also claimed a specific lien upon the proceeds of the sales, and the proceeds of a certain letter of credit and bills drawn in pursuance of it, to pay a balance due to him from the estate of Mactier, which was insolvent.   The parties, Frith and Mactier, had agreed in the autumn of 1822, to purchase a cargo of brandy in France, on the credit of Frith, and to be consigned to Mactier at New York, who, on its arrival, was to sell it, and remit the invoice cost to Frith at Jacmel, in provisions.   Frith was to sell them, and with the proceeds furnish a shipment of coffee to his correspondent in France, to pay the original cost of the brandy.   The profits of the adventures were to be equally shared by the parties.   The brandy was imported as agreed upon, and Frith having returned to Jacmel, before its arrival, writes to Mactier on the 24th of December, 1822, sending copies of letters of his correspondents to him on the subject of the " brandy order," and adds : " By the bye, as your brother before I left New York, declined taking the interest I offered him in this speculation, and wishing to confine myself in business as much as possible, so as to bring my concerns to a certain focus, I *would propose to you to take the adventure solely to your own account,* holding the value to cover the transaction to

my account in New York." Mactier answers—expressing his wish that the transaction should go on as proposed, but adds—" *I shall delay coming to any determination, till I again hear from you.* The prospect of a war between France and Spain may defeat the object of this speculation, as far as relates to the shipment of provisions hence to Hayti, to be invested in coffee for France, *in which case I will at once decide to take the adventure to my own account.*" He adds, that the war "*would operate to F.'s disadvantage.*" The brandy arrived March 12, 1823, at New York, and Mactier entered the brandy at the custom-house as owner, and not as consignee. The clerk of Mactier was permitted to testify, that Mactier told him on the arrival of the brandy, *that he should take it to himself.* Another witness testified to something of the same sort. On the 22d of March, Mactier sold 150 pipes of it. The remainder was put in the public store and bonded. On the 25th of March, Mactier wrote to Frith, advising him of the arrival of the brandy, and says, " In compliance with the wish expressed in yours of the 24th of December, and my answer thereto of 17th January last, *I have decided to take this adventure to my own account,*" and that he has credited him with the amount of the invoice, $14,254. To this letter was a postcript, dated March 31. On the 28th of March, Frith wrote to Mactier, in which letter he says—" With regard to this adventure, I *would wish to confirm what I mentioned to you some time ago,*" &c. Previous to the arrival of the last letter, Mactier was dead, he having died on the 10th of April, 1823. On the 21st of April, Frith again addressed a letter to Mactier, in which he acknowledges the receipt of Mactier's letter of the 25th March—says he has "*noted its contents,*" and requests Mactier to charter on his account a staunch, first class vessel, and send out to Jacmel by her, 400 barrels of flour, 150 barrels of pork, &c., &c. In the mean time, administration was granted to A. N. Lawrence and another, who, in May, 1823, gave bonds to secure the duties on the 50 pipes, took them from the public store, and sold them at public auction. The complainant, Frith, then filed his bill, claiming the brandy as his own, and that Mactier was only con-

signee, and that Mactier's letter of 25th March was not received till several days after his death, and that his own letter of April 21st, was written in ignorance of it. He avers that the promissory notes received by Mactier from the purchasers were in his possession at his death, and came to the hands of and were collected by defendants; claims the 50 pipes, &c. ; prays an account and a decree,· directing the defendants to retain the amount of his·claim, and to pay to him when Mactier's accounts shall be settled by the court.

The Chancellor held, "that Frith had not consummated the sale to Mactier ; and as survivor he was entitled to the nett proceeds of the brandy, so far as they can be traced or identified. The first offer to sell by Frith having been declined by Mactier, his subsequent assent to the proposal did not bind Frith unless he had also assented. The assent of Frith after the death of Mactier, and the fact that he died insolvent, being unknown to him, he was not bound by that acceptance of the offer, and the property was not changed. The Chancellor accordingly decreed, that he had a specific lien on the 50 pipes sold by the administrators, and on the proceeds of the notes remaining uncollected in Mactier's hands at his death.

The Court of Errors *reversed* the Chancellor's decree. Mr. Justice Marcy delivered a long and elaborate opinion in favor of reversal; p. *111,--126.* Four senators also delivered opinions, in the main, concurring with the views of Justice Marcy, to wit, *Maynard, Benton, Oliver and Throop.*

1. As to the doctrine of *relation* in regard to the letter of Mactier, accepting Frith's offer, which was not received till after M's death, Marcy J. says, " The doctrine of relation was discussed on the argument, and its application urged upon us. If, as was held in the court below the·bargain in this case could not be closed until Frith received M'.s letter accepting his offer to sell, the receiving that letter, it was said, might be considered as *having relation to the time when it was sent,* upon the principle that courts often resort to this doctrine of relation to prevent an injury resulting to a party from the act of God." " The doctrine of relation may be permitted to operate on these *formal acts*" (such as

enrolment of a deed of bargain and sale, &c.,) but it cannot be used to supply a *party* to a contract, who does not exist at the time when the act is done which fixes to it the seal of validity; or, what is the same thing, it cannot carry back that act to a time when parties capable of contracting did in fact exist. This view of the subject is conformable to the civil law as well as the law of France. *Pothier Traite du Contrat de vente.*"

2. He then considers the question, "Whether there was a contract, before Mactier's death, which had the consent of the contracting parties so given and so made known as to be binding on them? And he maintains that the offer of Frith must be considered as a continuing offer down to the time of Mactier's acceptance." "This doctrine," he says, which presumes the continuance of a willingness to contract after it has been manifested by an offer, is not confined to the civil law and the codes of those nations which have constructed their systems with the materials drawn from that exhaustless storehouse of jurisprudence: it is found in the common law: indeed it exists in case of necessity, whereever the power to contract exists in parties separated from each other. The case of *Adams* v. *Lindsell,* 1 Barn. & Ald. 681, proceeds upon and affirms the principle." He says, however, "the case of *McCullock* v. *The Eagle Insurance Company,* 1 Pick. 278, conflicts in principle according to my views of it, with this case."

"The principle of the decision of the King's Bench is simply that the *acceptance* of an offer made, through the medium of a letter, binds the bargain if the party makes the offer has not revoked it, before it is accepted. The rule laid down by the Supreme Court of Mass. regards the contract as incomplete until the party making the offer is *notified o˙ its acceptance,* or until the time when he should have received it, the party accepting having done what was incumbent on him to give notice." He then, after discussing the two cases, lays down the rule in such cases of offers made by letter between distant parties, as follows; "any thing that shall amount to a manifestation of a formed determination to accept, communicated or put in the proper way to be communicated to the party making the offer, would doubt-

less complete the contract; but a letter written would not be an acceptance so long as it remained in the possession or under the control of the writer." He therefore concludes that " an assent by one party to the offer of the other, does not require a knowledge of that assent by the other party to perfect the contract."

Applying this principle to the facts of the case, he says. " By a letter dated the 25th, with a postscript of the 31st of March, he accepted the offer. This letter was immediately transmitted to Frith, and as soon as the 28th of March, entries were made in his books showing that he had become the purchaser. Enough was done by the 31st to constitute an acceptance of Frith's offer and to complete the bargain if the offer can be considered as standing till that day." "In answering Mactier's letter which contained the acceptance of his offer, (Frith's letter of the 21st of April, 1823,) he recognizes the bargain as closed, and gives directions as to investing the proceeds of the brandy. All the subsequent correspondence acquiesces in the sale."

After adverting to the objection drawn from the alleged fraudulent conduct of Mactier in suppessing the fact of his having already sold at a profit 150 pipes of the brandy ; and declaring that he sees no ground for the presumption of fraud, he says, " My conclusion therefore is that the contract was consummated between the parties before the death of Mactier, by which he acquired all Friths right to the 200 pipes of brandy.

He then reviews the argument in regard to the right of stoppage *in transitu*, and holds that it cannot apply. · " I have seen no case where this right was held to attach on the death of the purchaser, if his estate was solvent. I think the seller could not, in such case, justify an interference with the goods sold while on their transit." " Granting at the same time that he had the right, and that they were to be considered as in their transit while they remained in the custom house at New York, it may be asked what did he do to stay the delivery of them to the administrators of Mactier? Did he forbid the public officer to deliver them ? This I believe is not pretended. The administrators took possession of them

in May or June, and sold them as a part of the estate of their intestate, and the first act in relation to them on the part of Frith was in July. They can rightfully hold the avails thereof, unless Frith had rescinded the contract by stopping the brandy before it came to their actual possession. This he did not do, nor did he perform any other act equivalent to it."

"Upon the view of the whole of this case, I entertain the opinion that the decree of the Chancellor ought to be *reversed*."

Chief Justice Savage, and Justices Sutherland and Marcy and 18 senators voted for *reversal ;* three senators for affirmance; and after some discussion as to costs, it was decided that appellants should recover their costs, by a vote of 14 to 12.

*Sale and Delivery of Goods ; Credit ; Assignment ; Fraud.*